UNITED STATES DISTRICT COURT
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**
**CASE NO. 3:26-cv-1781-MMH-LLL**

FIDELITY BROKERAGE SERVICES LLC,

Plaintiff,

v.

PETER SULLIVAN

Defendant.

---

## AMENDED COMPLAINT

Plaintiff Fidelity Brokerage Services LLC ("Fidelity") files this Amended Complaint against its former employee Peter Sullivan ("Sullivan") and seeks injunctive relief against Defendant to enjoin his violations of the restrictive covenants in Sullivan's 2019 Employee Agreement with Fidelity (the "2019 Agreement") and to prevent his misappropriation of Fidelity's trade secrets in violation Florida and federal law protecting trade secret information.

## PARTIES, JURISDICTION, AND VENUE

1. Fidelity is a Delaware Limited Liability Company whose sole member is Fidelity Global Brokerage Group, Inc., a corporation organized and existing under the laws of Massachusetts with its principal place of business located in Boston, Massachusetts. Fidelity is a member firm of FINRA.

2. Sullivan is a former Vice President Financial Consultant in Fidelity's Investor Center in Jacksonville, Florida. He is an adult citizen and resident of the state of Florida. Sullivan is registered with FINRA.

3. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this matter involves a cause of action arising under the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831 *et seq*. *See* 18 U.S.C. § 1836(c) (West 2017) ("The district courts of the United States shall have original jurisdiction of civil actions brought under this section."). This Court has supplemental jurisdiction over the breach of contract and other state law claims herein pursuant to 28 U.S.C. § 1367 because the claims are so related to the DTSA claim for which this Court has original jurisdiction that they form part of the same controversy. Notably, the Defendant has used Fidelity's trade secret customer information to solicit Fidelity customers.

4. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the parties are of diverse citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5. Venue is proper in this District because Sullivan worked in this District and most or all of the conduct alleged in this Amended Complaint occurred within this District.

**NATURE OF THE CASE**

6. Through this action, Fidelity seeks injunctive and other relief to stop Sullivan's continuing violation of his 2019 Employee Agreement and to prevent Sullivan's further misappropriation and misuse of Fidelity's trade secrets and unfair competition.

7. Sullivan worked in Fidelity's retail brokerage operations as the Vice President Financial Consultant at Fidelity's Investor Center in Jacksonville, Florida. In connection with his employment, Sullivan was assigned customers to service on behalf of Fidelity. *See* Affidavit of Craig Stacey ("Stacey Aff."), attached hereto as Exhibit A, at ¶¶ 4-5.

8. The customers primarily assigned to Sullivan as of the time of his resignation on July 1, 2026 had over $1.47 billion in assets at Fidelity, with more than $660 million of assets under management at Fidelity. Ex. A (Stacey Aff.) at ¶ 5. Sullivan had daily access to and was entrusted with knowledge of confidential Fidelity information relating to approximately 415 households. *Id.*

9. Sullivan has used Fidelity's confidential and trade secret customer information, which he had access to only by virtue of his employment with Fidelity, to solicit Fidelity customers to transfer their business to his new employer, Farther Finance Advisors, LLC ("Farther"), a direct competitor of Fidelity.

10. Sullivan has solicited, and will likely continue to solicit, Fidelity customers to transfer their business from Fidelity to Sullivan's new firm, Farther. In addition, Sullivan has solicited, and will likely continue to solicit, Fidelity employees to join him at Farther.

11. Fidelity seeks an injunctive order prohibiting further solicitation of Fidelity clients and Fidelity employees by Sullivan. Fidelity also seeks an order requiring Defendant to return to Fidelity any and all data, records, and/or documents in any form, received or removed from Fidelity by Sullivan, containing information pertaining to customers he serviced or whose names became known to Sullivan while in the employ of Fidelity. These documents and information, include, but are not limited to, any customer lists or documents replicated or "recreated" by Sullivan from memory or otherwise, including by using his memory to look up customer names in public sources. This injunctive relief is necessary to end and prevent any further violations of Sullivan's contractual obligations and the misuse of Fidelity's trade secrets.

12. The parties are obligated to arbitrate the merits of this dispute consistent with the arbitration rules and regulations of FINRA, including FINRA Rule 13200. Accordingly, Fidelity has filed with FINRA Dispute Resolution, Inc., a Statement of Claim seeking binding arbitration of its dispute with Sullivan pursuant to Rule 13804(a)(2).

13. While the final merits of this case will be resolved in arbitration before FINRA, Fidelity is required, pursuant to FINRA Rule 13804, to seek and obtain preliminary injunctive relief in the form of an injunctive order "from a court of competent jurisdiction" before an expedited hearing in FINRA for permanent injunctive relief is permitted to proceed. Once an injunction is issued by this Court, expedited arbitration will be scheduled by FINRA to take place within fifteen (15) days of the entry of the injunction. If no injunction is issued, however, this case cannot be heard by FINRA on an expedited basis and, instead, will be assigned to a standard-track arbitration, which would likely delay a hearing on the merits for a year or more. Therefore, injunctive relief is being sought in order to preserve the parties' *status quo* until the merits of this case can be adjudicated by FINRA.

## FACTS COMMON TO ALL COUNTS

### A. Fidelity's Unique Customer Development Practices

14. Fidelity and its affiliates provide a variety of financial services such as retirement services, investment planning, wealth management, securities execution and clearing, life insurance services, and equity services—to Fidelity customers, with whom Fidelity typically enjoys significant, long-term relationships. Fidelity offers individual investors a broad assortment of trading and cash management features including buying and selling stocks, bonds, options and thousands of mutual

funds from Fidelity and other well-known fund companies. Ex. A (Stacey Aff.) at ¶ 6.

15. Fidelity is unique in the retail brokerage field because Fidelity does not have its Financial Consultants, such as Sullivan, make "cold calls" to persons who have no relationship with Fidelity, or who were not referred to Fidelity. Rather, Fidelity assigns clients to Financial Consultants for servicing. *Id.* at ¶¶ 7-8.

16. Unlike most other financial firms, Fidelity requires, and compensates, its Financial Consultants to develop and service relationships based upon leads that Fidelity provides. *Id.* at ¶ 8.

17. Fidelity provides leads to its Financial Consultants from two primary sources.

18. First, Fidelity forwards information to its financial consultants from prospective customers who initiate contact with Fidelity either by telephone, over the internet, or in person. *Id.* at ¶ 9.

19. Fidelity and its affiliates devote tens of millions of dollars per year toward attracting customers to Fidelity's various businesses in a variety of means. Fidelity arranges to publish and broadcast national and local advertisements which invite potential customers to contact Fidelity; Fidelity maintains an interactive internet page that allows interested persons to establish relationships with Fidelity; Fidelity maintains multiple call centers that prospective customers can use to initiate

contact with Fidelity; and Fidelity maintains prominent retail locations which prospective customers can visit. *Id.*

20. A large portion of Fidelity's business is derived from this initial customer contact that is generated by significant investments of time, labor, and capital by Fidelity. *Id.*

21. Second, Fidelity forwards information to its Financial Consultants regarding customers assigned to that particular Financial Consultant, with whom those representatives, such as Sullivan, are paid to serve as the face of Fidelity, responsible for developing and sustaining customer relationships with those assigned customers. *Id.* at ¶ 10.

22. Fidelity's lead-based approach to supporting its Financial Consultants distinguishes Fidelity from most other full-service brokerages where individual financial consultants, rather than the firm, are responsible for establishing customer relationships. *Id.* at ¶ 11.

23. Fidelity's success in its lead-based approach is based on the typically long-standing relationships Fidelity has built and enjoys with its customers. *Id.* at ¶ 12.

24. For example, representatives may be assigned to service customers previously serviced by other representatives in certain circumstances, such as if the former representative moves, leaves Fidelity, or is promoted to another position.

Moreover, Fidelity clients may be serviced by multiple Fidelity representatives depending upon the clients' needs and service offerings in which they opt to participate at Fidelity.

**B. Fidelity's Trade Secret Customer Information**

25. Fidelity's success with its unique lead-based approach to supporting Financial Consultants, such as Sullivan, is directly tied to Fidelity's trade secret customer information, which is among Fidelity's most important assets. Ex. A (Stacey Aff.) at ¶ 12.

26. Fidelity customers are nowhere publicly identified as customers of Fidelity. *Id.* at ¶ 14.

27. Although Fidelity customer names, if already known to be Fidelity customers, may be found in public sources as general members of the public, the only way that they would be discernable as individuals with assets to invest and a demonstrated need and desire for investment services would be through an employee learning this information while entrusted by Fidelity to work with those assigned customers at Fidelity. *Id.* at ¶ 14.

28. Fidelity's customer data includes not only the names and contact information of Fidelity customers, but also includes financial information relating to those customers, such as customers' financial statements, investment goals, investment history, assets, income, and net worth. *Id.* at ¶ 13.

29. Fidelity developed its customer base through a significant investment of time, labor, and capital, as described above.

30. Fidelity maintains its customer data in confidence, both to preserve Fidelity's competitive advantage and to meet customer expectations that Fidelity will maintain sensitive, personally identifiable information (including their identity as a customer, contact information and financial information) in confidence. *Id.* at ¶ 15.

31. Fidelity derives substantial economic value from preserving its customer data as a trade secret. *Id.*

32. No competitor can determine who Fidelity customers are and effectively target them and address their needs without access to or specific knowledge of Fidelity's confidential customer data. In this way, maintaining and protecting the confidentiality of Fidelity's customer data, specifically including customer identities, provides Fidelity with a significant competitive advantage over its competitors. *Id.*

**C. Fidelity's Efforts to Preserve the Confidentiality of Its Customer Data**

33. Fidelity preserves its customer data so that it does not become available to competitors who could use the data to divert customers, without the investment of time, labor, and capital that Fidelity made to compile the information. Fidelity

does not provide its trade secret customer data to competitors. Ex. A (Stacey Aff.) at ¶ 16.

34. Fidelity maintains its customer data on password-protected computers, and only employees whose jobs require access to the customer data are provided with such access. *Id.*

35. Fidelity also preserves its customer data by requiring employees, including Sullivan, to sign a standard Fidelity Employee Agreement in which each employee agrees not to use or disclose Fidelity confidential information. *Id.* at ¶ 17.

36. Fidelity records indicate that Sullivan signed an Employee Agreement with Fidelity on February 4, 2017. *Id.* at ¶ 18. A copy of the 2017 Agreement is attached to the Stacey Aff. as Exhibit 1.

37. In June 2019, Sullivan left Fidelity and joined Fisher Investments. *See* Supplemental Affidavit of Craig Stacey ("Supplemental Stacey Affidavit"), attached hereto as Exhibit B, at ¶¶ 5.

38. Within months, however, Sullivan returned to Fidelity in a Financial Consultant role similar to his prior position. *Id.* at ¶ 6.

39. On November 13, 2019, as a condition of employment at Fidelity, Sullivan executed a new Employee Agreement with Fidelity, the 2019 Agreement. *Id.* at ¶ 7. A copy of Sullivan's signed 2019 Agreement is attached as Exhibit 1 to the Supplemental Stacey Affidavit.

40. The terms of Sullivan's 2019 Agreement, including prohibitions on the solicitation of Fidelity customers and employees, as well as the provisions regarding access to and use of Fidelity's Confidential Information, are identical to the terms in his 2017 Employment Agreement. *Id.* at ¶ 8. *See* Ex. A (Stacey Aff.), Ex. 1 & Ex. B (Suppl. Stacey Aff.), Ex. 1.

41. In his 2019 Agreement, as he did in his prior contract, Sullivan acknowledged the confidentiality of Fidelity's records and agreed that Fidelity's "Confidential Information" includes Fidelity's customer lists and customer information. Ex. B (Suppl. Stacey Aff.), Ex. 1 at ¶ 1.

42. Sullivan promised to use Fidelity's Confidential Information and trade secrets only in the course of his employment with Fidelity and not to divulge Fidelity's trade secrets to third parties. *Id.*

43. Sullivan promised that, upon termination of employment, he would "return all company property . . . including but not limited to Confidential Information." *Id.* at ¶ 3.

44. Sullivan promised that, following termination of employment, he would not use Fidelity's Confidential Information to solicit Fidelity's clients. *Id.* at ¶ 6.

45. Sullivan promised that during his employment and for a period of one year following termination of his employment he would not "directly or indirectly

… solicit in any manner or induce or attempt to induce any customer or prospective customer with whom Employee had personal contact or about whom Employee otherwise learned during the course of the Employee's employment with the Fidelity Companies." *Id.*

46. Sullivan further promised that during his employment and for a period of one year following termination of his employment he would not "directly or indirectly . . . solicit in any manner[] or induce or attempt to induce any employee of any of the Fidelity Companies to leave his/her employment." *Id.*

47. Sullivan recognized and agreed that any violation of the 2019 Agreement—including after his termination—would cause Fidelity irreparable damage and would entitle Fidelity to seek injunctive relief to protect its trade secret customer information. *Id.* at ¶ 10.

48. Fidelity also maintains and advises its employees of a Corporate Information Protection Policy that is displayed on Fidelity's intranet. *See* Ex. A (Stacey Aff.) at ¶ 20. A true and correct copy of Fidelity's Corporate Information Protection Policy is attached to the Stacey Affidavit as Exhibit 2. Fidelity periodically reminds its employees of this policy and provides employees with an Information Protection Policy Quick Reference Card ("QRC") explaining how to protect specific types of Fidelity confidential information. A copy of Fidelity's QRC is attached to the Stacey Affidavit as Exhibit 3.

49. Fidelity has been vigilant in protecting its customers' privacy because most Fidelity customers do not want, and have not authorized, Fidelity to share their contact or financial information outside of Fidelity. *Id* at ¶ 44.

50. Furthermore, Fidelity is required by federal law to prevent the disclosure to third parties of nonpublic customer information, including customers' contact information and financial information. The Gramm-Leach-Bliley Act declares, "[i]t is the policy of the Congress that each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a) (2012). The Act's implementing regulation, known as Regulation S-P, prohibits the disclosure of so-called "nonpublic personal information" to third parties without consent. 17 C.F.R. § 248.10 (2017). Nonpublic personal information is defined to include customer lists from financial institutions, even if those lists contain only names of Fidelity customers because the identity of an individual as being a customer of a particular financial institution is specifically protected by the federal regulations. 17 C.F.R. § 248.3(t)(1) (2017); 17 C.F.R. § 248.3(u)(2)(i)(D) (2017). Indeed, these regulations also protect a customer's account information. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u)(1).

51. Fidelity's confidential customer information, including its customers' names, the fact that the customers are persons with both the means and the interest

in seeking financial advice, and the specific and personal financial information relating to those customers, such as customers' financial statements, investment goals, investment history, assets, income, and net worth, meets the elements of and is trade secret information.

**D. Sullivan Misappropriated Fidelity's Trade Secret Customer Information and Is Using It for the Benefit of Himself and His New Firm**

52. Sullivan signed the 2019 Agreement on November 13, 2019. Ex. B (Suppl. Stacey Aff.) at ¶ 7; *see id.* at Ex. 1.

53. As consideration for the 2019 Agreement, Fidelity hired Sullivan, compensated him throughout his employment, promoted him, provided him with continuing on-the-job training and education, and provided him with access to confidential customer information. *Id.* at ¶ 9.

54. Additional consideration included assigning customers to Sullivan to service, providing Sullivan with the resources to enable him to succeed at Fidelity, including support services, market reporting services, research, sales assistance, access to and use of experts in asset management, tax, estate planning and insurance, and all other requirements necessary to best perform his job responsibilities for Fidelity's customers. Fidelity also registered Sullivan with FINRA. *Id.*

55. On Fidelity's behalf, Sullivan was empowered by Fidelity to engage in repeated, regular communications with Fidelity customers. As such, like all Financial Consultants, Sullivan was entrusted to become the face of Fidelity to the

customers he was assigned to service and, because of the nature of the interactions, became Fidelity's direct link to these customers. Ex. A (Stacey Aff.) at ¶ 21.

56. On July 1, 2026, Sullivan advised Fidelity of his intention to resign from Fidelity, effective July 31, 2026. Sullivan notified Fidelity that he intends to join Farther, a direct competitor of Fidelity. *Id.* at ¶ 22. A true and correct copy of Sullivan's resignation letter is attached to the Stacey Affidavit as Exhibit 4.

57. Immediately upon notifying Fidelity of his resignation, Sullivan began his "notice period" pursuant to Fidelity's "Notice of Resignation Provision." *Id.* at ¶ 24. A true and correct copy of Notice of Resignation Provision is attached to the Stacey Affidavit as Exhibit 5. The stated purpose of the notice period is to pursue and protect the "interest of [Fidelity's] clients" in the reassignment and transition of the departing "Employee's work for those clients to other Fidelity personnel and for [the departing] Employee to remain available to assist Fidelity with that reassignment and transition." Ex. A (Stacey Aff.) at ¶ 25 & Ex. 5 at ¶ 1; *see id.*, Ex. 5 at ¶ 4 ("Employee understands and agrees that a core purpose of the Notice Period is to enable the orderly transition of files, data, and client responsibility to other Fidelity employees …").

58. During his notice period, Sullivan remained a Fidelity employee whose primary duties comprised helping Fidelity transition client relationships, client files,

client and business data, and client responsibility to other Fidelity personnel. Ex. A (Stacey Aff.) ¶ 26 & Ex. 5 at ¶ 4.

59. Pursuant to the Notice of Resignation Provision, Sullivan agreed that he would not "remotely access Fidelity systems." Ex. A (Stacey Aff.) ¶ 27 & Ex. 5 at ¶ 4. Sullivan further agreed that he would, "within one business day of tendering [his] notice of resignation, [he would] disconnect from any Fidelity customer or prospective customer [he was] connected with on any networking sites, such as LinkedIn, and [would] not use any social networking system or function to update any customer or prospective customer about [his] employment status with Fidelity and/or any impending change of such status." *Id.*

60. On the same day that Sullivan tendered his resignation, Fidelity met with him to discuss his notice period and his continuing obligations to the firm. Ex. A (Stacey Aff.) at ¶ 28; Ex. B (Suppl. Stacey Aff.) at ¶ 10. Fidelity expressly explained to Sullivan that, pursuant to and consistent with the Notice of Resignation Provision and his 2019 Employment Agreement, he was prohibited from soliciting any of Fidelity's customers or prospects during the notice period and for one year after the end of the notice period and his termination. Ex. A (Stacey Aff.) at ¶ 29; Ex. B (Suppl. Stacey Aff.) at ¶ 11. Indeed, Fidelity told Sullivan that, except as directed by Fidelity, he was not permitted to communicate with clients who were previously assigned to him. Ex. A (Stacey Aff.) at ¶ 29. Fidelity also made clear to Sullivan that

he was prohibited from using or disclosing Fidelity's confidential or proprietary, including customer lists, customer names, customer financial information, or other Fidelity business information, for any purpose not expressly assigned by and agreed to by Fidelity. *Id.* at ¶ 30. Lastly, Sullivan was instructed to immediately (no later than the next day) disconnect from any Fidelity customer or prospects that he was connected with on professional networking sites, such as LinkedIn. *Id.* at ¶ 31.

61. At this meeting, Sullivan acknowledged having reviewed Fidelity's Notice of Resignation Provision. *Id.* at ¶ 32. He further acknowledged the directives and instructions regarding his status and obligations provided by Fidelity. *Id.* at ¶ 33. Sullivan expressed his understanding of his position and duties and stated his intention to comply with his 2019 contract, Fidelity's policies, and his appertaining duties. Ex. A (Stacey Aff.) at ¶ 34; Ex. B (Suppl. Stacey Aff.) at ¶ 11.

62. Fidelity has received information and evidence establishing that, after he announced his intended July 31, 2026 departure from Fidelity, but prior to the expiration of his notice period and the termination of his employment at Fidelity—that is, ***while still an employee of Fidelity***—Sullivan contacted Fidelity customers for the purpose of soliciting and inducing them to cease doing business with Fidelity and transfer their business to Farther. Ex. A (Stacey Aff.) at ¶ 35.

63. Specifically, a Fidelity customer has informed Fidelity that, on Saturday, July 4, 2026, Sullivan texted her using his personal phone number to

request that she agree to meet with him. *Id.* at ¶ 36 & Ex. 6. Sullivan contacted this individual precisely because he had learned through Fidelity that she was (a) a Fidelity customer (b) had assets to invest and (c) had exhibited a demonstrated need and desire for investment services. This was all confidential information that Sullivan knew only by virtue of his employment with Fidelity.

64. Fidelity has also learned that, notwithstanding his duty to immediately disconnect with Fidelity clients on his social media accounts, Sullivan used LinkedIn messaging services to contact another Fidelity customer, the son of the customer who received the July 4 text, to request a meeting with both customers. *Id.* at ¶ 37 & Ex. 7. Sullivan again used Fidelity confidential customer information to determine whether to contact this second individual.

65. Sullivan's contacts were not in response to any outreach by these customers, as neither had emailed, called, or texted Sullivan to request a meeting with him. In fact, both customers raised concerns with Fidelity about the suspicious unsolicited messages. *Id.* at ¶ 37.

66. In addition, Sullivan has placed a voicemail message on his personal cell phone telling customers that he is joining Farther and that their assets will remain custodied at Fidelity.[1] *Id.* at ¶ 40.

---

[1] Sullivan was not permitted to engage in customer conversations at Fidelity on his personal cell phone. Still, he has clearly provided Fidelity customers with that number and is anticipating their return calls regarding Farther and where assets may be custodied in any change of financial

67. Fidelity has also received from Bailey Aldridge, a Fidelity employee who worked together with Sullivan, a screen shot of a text message sent to him from Sullivan on or around July 7, 2026. *Id.* at ¶ 38; *see id.*, Ex. 8. Again, at this time, Sullivan was in his notice period and was still an employee of Fidelity. Sullivan's text establishes that Sullivan had a conversation with a Fidelity client, "Bert,"[2] during which Sullivan "explained [the] whole transition" of his accounts. *Id.* Sullivan informed Aldridge that this Fidelity client was "on board" with the proposed move. *Id.* Sullivan contacted "Bert" because Sullivan knew that he was a Fidelity customer, and, rather than accessing information about this customer to advance Fidelity's interests, Sullivan misused Fidelity confidential information regarding "Bert" to contact this client in pursuit of Sullivan's own personal interests.

68. Upon information and belief, Sullivan removed or retained information regarding Fidelity's clients, including who those individuals are, the fact that they are Fidelity customers, and their contract information, following termination of his employment with Fidelity and he is using and, absent injunctive relief, intends to continue using that information to contact Fidelity clients in further violation of the

institutions, routing the calls to his personal cell to avoid detection by Fidelity. Ex. A (Stacey Aff.) at ¶ 41.

[2] Bert K. is a Fidelity customer. Ex. A (Stacey Aff.) at ¶ 38. While Fidelity is not permitted to disclose the identity of its customers in a publicly available pleading, it is prepared to provide the Court with such information.

non-solicitation, non-disclosure and confidentiality obligations in the 2019 Agreement.

69. Fidelity has also discovered that Sullivan has solicited its employees. Specifically, in the above-referenced text message he sent to Bailey Aldridge, Sullivan made clear his position that he "would like to provide [Aldridge] a better opportunity with Farther," as well as noting that the Fidelity customer, "Bert," would "really would like [Aldridge] to go [to Farther] with [Sullivan] too!" *Id.* at ¶ 39; *see also id.*, Ex. 8. That is, Sullivan encouraged Aldridge to leave his employment with Fidelity and to join him at Farther and has shared that recruiting effort with at least one Fidelity customer. Notably, Sullivan asked Aldridge to delete the text, confirming that Sullivan understood that he was deliberately violating his Fidelity 2019 Agreement and is actively attempting to hide the evidence of such breaches. *Id.*

70. On July 9, 2026, Fidelity confronted Sullivan about his activities, including whether he was contacting Fidelity customers by text and/or LinkedIn. *Id.* at ¶ 42. Sullivan denied that he had done so. Sullivan's Fidelity employment was then terminated. *Id.*

**E. The Threat of Immediate and Irreparable Harm Fidelity Faces from Sullivan's Misconduct**

71. Sullivan's misconduct has irreparably harmed Fidelity and will continue to irreparably harm Fidelity if not stopped immediately. Indeed, Sullivan's

conduct has and will continue to irreparably harm Fidelity's relationships with its customers, such as by losing goodwill, losing future business or referrals, as well as losing trust and confidence in securing their inherently private information. Fidelity's harm, and the threat of additional and ongoing harm, cannot be calculated with precision and cannot be adequately compensated. *See* Ex. A (Stacey Aff.) at ¶ 44.

72. Fidelity customers rightfully have an expectation that their confidential contact and financial information, such as their net worth, risk tolerances, investment goals, and preferences, will be protected and not misused by departing employees. Thus, customers understandably are concerned when former Fidelity employees, such as Sullivan, have access to their information and use it to solicit their business away from Fidelity toward other firms with which the customer has no relationship. *Id.*

73. In other words, the damage to Fidelity's customer relationships has already occurred and is ongoing and is incalculable, as Fidelity cannot put a price on the value of its customer relationships or the damage caused when Sullivan improperly misuses confidential and trade secret customer information.

74. Based on all the foregoing facts and conduct, Fidelity believes and thereon alleges that Sullivan prepared to engage in, engaged in, and continues to engage in the following wrongful acts:

- use and/or disclosure of Fidelity's trade secret customer information and misappropriation of the trade secret information contained in confidential Fidelity business records, including specifically the names, addresses, phone numbers, and/or other confidential financial information of Fidelity customers;
- solicitation of Fidelity customers to transfer their assets away from Fidelity and to a competitor; and
- solicitation of Fidelity employees to induce or attempt to induce them to leave their employment at Fidelity.

75. Fidelity has been and continues to be damaged, both monetarily and irreparably, by the actual and threatened loss of customers and customer goodwill caused by Sullivan's solicitation of Fidelity's customers, solicitation of Fidelity employees, and misappropriation and misuse of Fidelity's trade secret customer information.

76. Fidelity asks for the Court's assistance in protecting its trade secret information and stopping Sullivan's knowing and intentional contractual breaches pending arbitration that will make final determinations regarding Fidelity's claims.

77. In doing the acts described herein, Sullivan has harmed Fidelity by, among other things, improperly garnering, retaining, disclosing and utilizing Fidelity's confidential and proprietary information and trade secrets, in violation of federal and Florida law, to give Sullivan and Farther a competitive edge over Fidelity, attempting to poach Fidelity's customer accounts, soliciting Fidelity's

employees to leave his/her employment, and diminishing Fidelity's reputation and goodwill.

78. Unless Sullivan is temporarily and preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a) Disclosure of trade secrets and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b) Use of Fidelity's trade secrets to solicit customers on behalf of a competitor;

(c) Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

(d) Loss of Fidelity employees; and

(e) Potential future economic loss, which is presently incalculable.

79. Thus, Fidelity is entitled to injunctive relief.

**<u>COUNT I</u>**
**(Breach of Contract)**

80. Fidelity hereby realleges and incorporates by reference the allegations set forth in paragraphs 1-79 above, as though set forth in full.

81. Fidelity's 2019 Agreement with Sullivan is a valid and enforceable contract supported by adequate consideration. *See supra* at ¶ 36 (citing Stacey Aff. at ¶ 18 & Ex. 1).

82. In the 2019 Agreement, Sullivan acknowledged that as a consequence of his employment with Fidelity, he would be given access to Confidential Information about Fidelity's clients. As described above, this information was provided to Sullivan not only at the outset of his employment, but he was also provided with continuing access to an evolving and nearly continually updated pool of information about the Fidelity clients that he was assigned to service, all of which was essential to his ability to perform his job duties. *See supra* at ¶ 41 (citing Suppl. Stacey Aff., Ex. 1 at ¶ 1). Fidelity has otherwise performed all conditions, covenants and promises required of it under the 2019 Agreement.

83. The restrictive covenants in the 2019 Agreement are justified by Fidelity's legitimate business interests in: (1) protecting Fidelity's trade secret customer information including customer lists and customer financial information; (2) protecting Fidelity's valuable customer relationships; and (3) protecting against loss of customer goodwill, confidence, and trust in Fidelity.

84. Pursuant to the terms of his 2019 Employee Agreement, Sullivan agreed to keep Fidelity's records, including particularly Fidelity's customer lists and customer information, confidential. *See supra* at ¶ 42 (citing Suppl. Stacey Aff., Ex. 1 at ¶ 1).

85. Sullivan promised to use Fidelity's customer information only in the course of his employment with Fidelity and promised not to divulge Fidelity's customer information to third parties. *See supra* at ¶ 42.

86. Sullivan violated the confidentiality and non-disclosure provisions of his 2019 Employee Agreement by using Fidelity's confidential customer information on behalf of himself, including by using that information to contact and solicit Fidelity clients to follow him to Farther. *See supra* at ¶¶ 44-47.

87. Sullivan promised to return any of Fidelity's customer information in his possession to Fidelity upon termination of his employment. *See supra* at ¶ 43 (citing Suppl. Stacey Aff., Ex. 1 at ¶ 3).

88. Sullivan sought to circumvent and in fact breached this provision of his 2019 Agreement by, on information and belief, either taking the Confidential Information, or creating or recreating the Confidential Information from memory for competitive use at his new firm. *See supra* at ¶ 42-43.

89. Sullivan promised that he would not solicit Fidelity customers both during his employment and for a period of one year after his termination. *See supra* at ¶ 43 (citing Suppl. Stacey Aff., Ex. 1 at ¶ 3).

90. Sullivan breached the customer-non-solicitation provision of his 2019 Agreement by soliciting Fidelity customers to transfer their business to Farther. *See supra* at ¶¶ 44-47, 60-63; Ex. B (Suppl. Stacey Aff.), Ex. 1 at ¶ 3.

91. Sullivan also breached the employee-non-solicitation provision of his 2019 Agreement by soliciting Fidelity employees to leave their employment with Fidelity. *See supra* at ¶ 69.

92. Sullivan has violated, continues to violate, and will continue to violate his contractual obligations in the future. *See supra* at ¶¶ 62-66.

93. As a consequence of the foregoing, Fidelity has suffered and will continue to suffer irreparable harm for which it lacks an adequate remedy at law, as well as present economic loss and other incalculable financial loss, unless this Court enjoins Sullivan from continuing to violate his 2019 Agreement and orders Sullivan to comply with the terms of the 2019 Agreement.

94. In his 2019 Agreement, Sullivan expressly agreed that "violation of this Agreement will cause irreparable damage" to Fidelity. *See supra* at ¶ 45.

95. Pursuant to §542.335, Florida Statutes, Sullivan's violations of the restrictive covenants in the 2019 Agreement may be enjoined. Unless Sullivan is enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a) Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b) Use of Fidelity's trade secrets to solicit customers to transition their business to a competitor;

(c) Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

(d) Loss of Fidelity customers and employees; and

(e) Potential future economic loss, which is presently incalculable.

## COUNT II
**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act – 18 U.S.C. § 1836 *et seq*.)**

96. Fidelity hereby realleges and incorporates by reference the allegations set forth in paragraphs 1-79 above, as though set forth in full.

97. The above-alleged facts constitute actual and threatened misappropriation of trade secrets by Sullivan pursuant to the Federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq*. *See supra* at ¶¶ 25-70 (citing Stacey Aff. at ¶¶ 12-17, 19, 21, 25-42 & Exs. 1-8).

98. Fidelity is the owner of confidential, trade secret information and data as defined under the DTSA, including the contact and confidential financial and account information of Fidelity customers. 18 U.S.C. § 1839(4). *See supra* ¶¶ 26-32.

99. Fidelity's above-described trade secrets are subject to reasonable efforts by Fidelity to maintain their secrecy and/or confidentiality. Fidelity's customer information is not generally known. *See supra* at ¶¶ 33-51 (citing Stacey

Aff. at ¶¶ 16-19, 21, 44 & Exs. 1-3). This information is not known outside of Fidelity and its employees and is difficult for others to properly acquire or independently duplicate. *See* Ex. A (Stacey Aff.) at ¶¶ 14-16.

100. Sullivan had access to and became aware of Plaintiffs' confidential, trade secret information and data solely by virtue of his employment with Fidelity. *See id.* at ¶ 14; *see also supra* ¶ 27.

101. Sullivan has misappropriated and misused Fidelity's customer information without Fidelity's consent. Sullivan engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Sullivan owed and continues to owe Fidelity as a former agent, employee, and representative of Fidelity. *See supra* at ¶¶ 56-70 (citing Stacey Aff. at ¶¶ 25-42 & Exs. 4-8).

102. Fidelity's trade secret information is related to products and services that are used in, and intended for use in, interstate commerce. 18 U.S.C. § 1836(b)(1).

103. Such information is also protected as "non-public" information under federal securities Regulation S-P. 17 C.F.R. § 248.3(t)(1); 17 C.F.R. § 248.3(u). Accordingly, Fidelity is required by federal statute to ensure that non-public customer contact, financial, and account information such as that misappropriated by Sullivan is not disclosed to third parties without consent. 17 C.F.R. § 248.10.

104. Plaintiffs' confidential, trade secret information and data derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, other persons who can obtain economic value from its disclosure or use. *See supra* at ¶ 31 (citing Stacey Aff. at ¶ 15).

105. Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law, from Sullivan's ongoing misappropriation and misuse of Fidelity's trade secret customer information. *See supra* at ¶¶ 71-75 (citing Stacey Aff. at ¶ 44); Ex. A (Stacey Aff.) at ¶ 45.

106. Unless Sullivan is temporarily and preliminarily enjoined from the foregoing conduct, Fidelity will be irreparably harmed by:

(a) Disclosure of trade secrets, customer lists, and other trade secret confidential information that is solely the property of Fidelity and its customers;

(b) Use of Fidelity's trade secrets to solicit customers to transition their business away from Fidelity;

(c) Loss of confidentiality of clients' trade secret records and financial dealings, loss of confidence and trust of clients, loss of goodwill, and loss of business reputation;

(d) Loss of Fidelity customers and employees; and

(e) Potential future economic loss, which is presently incalculable.

*See supra* at ¶ 78; Ex. A (Stacey Aff.) at ¶¶ 44-45.

107. Sullivan's conduct constitutes a willful and malicious misappropriation of Fidelity's trade secrets.

**COUNT III**
**(Misappropriation of Trade Secrets Under Florida Law)**

108. Fidelity hereby realleges and incorporates by reference the allegations set forth in paragraphs 1-79 above, as though set forth in full.

109. The books, files and records of Fidelity, the confidential information contained therein, and especially the data pertaining to Fidelity clients, including clients' names and addresses, as well as additional information such as clients' social security numbers, account numbers, financial status, financial statements, investment objectives and preferences, assets and/or securities held by these customers, and other highly confidential personal and financial information concerning Fidelity's clients, are trade secrets of Fidelity subject to protection under the Florida Uniform Trade Secrets Act, § 688.01, Fla. Stat. *et seq*. *See supra* at ¶¶ 25-32 (citing Stacey Aff. at ¶¶ 12-15).

110. This information derives independent economic value by not being accessible, through proper means, to competitors such as Sullivan and Farther who can profit from its use or disclosure. The identities of Fidelity's clients are not readily available to the public or to Fidelity's competitors. The strength, nature and

composition of the practices assigned to Fidelity's employees are not readily available to the public or to Fidelity's competitors. Fidelity has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which is of great value to any competitor. *See* Ex. A (Stacey Aff.) at ¶¶ 14-17.

111. Fidelity has taken more than adequate measures under the circumstances to maintain the secrecy of this information, including assigning computer access passwords to be used to access Fidelity computer systems and records, restricting access to its business premises, and having employees, including Sullivan, sign agreements which expressly prohibit the use and disclosure of such information outside of Fidelity. *See supra* at ¶¶ 33-51 (citing Stacey Aff. at ¶¶ 16-19, 21, 44 & Exs. 1-3).

112. Fidelity's trade secrets would provide a distinct unfair advantage to any competitor of Fidelity, including Sullivan and Farther. *See* Ex. A (Stacey Aff.) at ¶ 15.

113. The foregoing conduct of Sullivan constitutes an actual and threatened misappropriation and misuse of Fidelity's trade secret information in violation of the Florida Uniform Trade Secrets Act, § 688.01, Fla. Stat. *et seq. See supra* at ¶¶ 25-70 (citing Stacey Aff. at ¶¶ 12-17, 19, 21, 25-42 & Exs. 1-8).

114. Upon information and belief, Sullivan has acquired and used Fidelity's customer information without Fidelity's consent. Sullivan engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Sullivan owed and continues to owe Fidelity as a former agent, employee, and representative of Fidelity. *See supra* at ¶¶ 56-70 (citing Stacey Aff. at ¶¶ 25-42 & Exs. 4-8).

115. Because Sullivan's unlawful conduct is ongoing, Fidelity faces an immediate threat of continuing irreparable harm, for which Fidelity lacks an adequate remedy at law. *See supra* at ¶¶ 71-75 (citing Stacey Aff. at ¶ 44); Ex. A (Stacey Aff.) at ¶ 45.

116. Pursuant to the Florida Uniform Trade Secrets Act, Chapter 688, Florida Statutes, Fidelity is entitled to injunctive relief.

## **PRAYER FOR RELIEF**

For the reasons set forth above, Fidelity respectfully requests:

1. A judgment in its favor and against Sullivan for preliminary injunctive relief;

2. An injunctive order providing preliminary injunctive relief until further order of the Court:

(a) Enjoining Sullivan, effective immediately, from using, disclosing, transmitting, or continuing to possess for any

purpose, the information contained in the records of Fidelity regarding those Fidelity customers whom Sullivan served or whose names became known to him while in the employ of Fidelity, including, but not limited to, the names, addresses, and confidential financial information of those customers;

(b) Enjoining Sullivan from soliciting, inducing, or attempting to induce, whether directly or indirectly, and whether alone or in concert with others, any business from any Fidelity customer whom Sullivan served or whose name became known to Sullivan while in the employ of Fidelity, including, without limitation, all customers he learned of through his employment with Fidelity;

(c) Enjoining Sullivan, effective immediately, from soliciting, inducing, or attempting to induce, whether directly or indirectly, and whether alone or in concert with others, any employee of the Fidelity Companies to leave his/her employment; and

(d) Ordering Sullivan, and anyone acting in concert with him, to return to Fidelity any and all records, information and/or documents in any form, received or removed from Fidelity by Defendant Sullivan or containing information pertaining to customers of Fidelity whom Sullivan served or whose name

became known to him while in the employ of Fidelity, within five (5) days from the entry of this Court's Order, including any and all copies. This requirement includes all records, information or documents, in any form, created by Sullivan based on documents or information that was received or removed from Fidelity by him, and specifically includes any Fidelity customer information that may have been created or recreated by him from memory or by using memory to look up customer names and contact information in public sources, or derived from information created or recreated by Sullivan from memory; and

3. Enter such other and further relief as this Court may deem equitable and just.

Dated: July 28, 2026

Respectfully submitted,

*<u>/s/ Kelly H. Kolb</u>*
Kelly H. Kolb (Fla. Bar No. 0343330)
BUCHANAN INGERSOLL & ROONEY PC
401 E Las Olas Blvd, Suite 2250
Fort Lauderdale, FL 33301-4251
Tel: (954) 703-3944
kelly.kolb@bipc.com

Joseph A. Dougherty (*admitted pro hac vice*)
*LEAD COUNSEL*
BUCHANAN INGERSOLL & ROONEY PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102

Tel: (215) 665-5362
joseph.dougherty@bipc.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 28, 2026, a true and correct copy of the Amended Complaint was served by transmission of Notices of Electronic Filing generated by CM/ECF to those parties registered to receive electronic notices of filing in this case as follows:

Jay P. Lechner, Esq.
Sean M. McFadden, Esq.
**Cantrell Schuette, P.A.**
401 E. Jackson St., Suite 2340
Tampa, FL 33602
jlechner@lawcantrell.com
smcfadden@lawcantrell.com

Dated: July 28, 2026

*/s/ Joseph A. Doughtery*

Kelly H. Kolb (Fla. Bar No. 0343330)
BUCHANAN INGERSOLL & ROONEY PC
401 E Las Olas Blvd, Suite 2250
Fort Lauderdale, FL 33301-4251
Tel: (954) 703-3944
kelly.kolb@bipc.com

Joseph A. Dougherty (*admitted pro hac vice*)
*LEAD COUNSEL*
BUCHANAN INGERSOLL & ROONEY PC
50 S. 16th Street, Suite 3200
Philadelphia, PA 19102
Tel: (215) 665-5362
joseph.dougherty@bipc.com

*Attorneys for Plaintiff*